**Randolph T. ROSTEN and Philip W. Rosten, d/b/a Capital Plating & Machine Co. et al., Plaintiffs,**

v.

**BORGERUD MFG. CO., Inc., Defendant.**

Civ. No. 3620.

United States District Court
W. D. Wisconsin.

June 30, 1967.

Warren H. Stolper, Madison, Wis., Edward C. Vandenburgh, Arlington Heights, Ill., for plaintiffs.

Joseph A. Melli, Madison, Wis., Walther E. Wyss, Robert L. Rohrback, Mason, Kolehmainen, Rathburn & Wyss, Chicago, Ill., for defendant.

## FINDINGS OF FACT

JAMES E. DOYLE, District Judge.

1. Prior to January 4, 1965, the plaintiffs, Randolph T. Rosten and Philip W. Rosten, were partners doing business under the name Capital Plating & Machine Co., and had a regular and established place of business in Madison, Wisconsin, in this District. (Stip. Pl. Ex. 22)

2. On January 4, 1965, the plaintiff, Capital Plating & Machine Corporation, was incorporated under the laws of the State of Wisconsin and since that date said corporation has been in existence with a regular and established place of business in Madison, Wisconsin, in this District. (Stip. Pl. Ex. 22)

3. Defendant, Borgerud Mfg. Co., Inc., is a Wisconsin corporation having a regular and established place of business in Deerfield, Wisconsin, in this District. (Stip. Pl. Ex. 22)

4. United States Patent Number 2,906,332 (the patent in suit), was issued to the individual plaintiffs, Randolph T. Rosten and Philip W. Rosten as copartners, on September 29, 1959, by the United States Patent Office. (Stip. Pl. Ex. 22)

5. From September 29, 1959, until January 4, 1965, United States Patent Number 2,906,332 was owned by the individual plaintiffs, Randolph T. Rosten and Philip W. Rosten, as copartners. On January 4, 1965, Capital Plating & Machine Corporation took over the business of the former partnership, Capital Plating & Machine Co., and since that date the corporate plaintiff has had, and does have, the entire right, title and interest in and to said patent, together with the right to bring suit for any and all infringements thereof. (Stip. Pl. Ex. 22)

6. Commencing about the middle of 1955 and prompted by the demand of others, the individual plaintiffs commenced the development of a motorized version of a manually operated slide valve for water softeners that they had previously been selling. (Tran. pp. 22, 23, 310)

7. At that time, the competition of the individual plaintiffs was making a four-position hydraulically operated valve which had the problem that the valve operator would get out of phase, or out of step, with the timer requiring a manual manipulation to restore them to proper step or phase. (Tran. p. 24) The defendant encountered the same problem with the initial, non-infringing valve (Pl. Ex. 1) it made and sold. (Tran. pp. 203, 204, 207)

8. Another significant requirement in the development of an automatic control apparatus for water softener valves was to have a timer that would direct the operation of the valve even though the valve was driven for short intervals (e. g., 15 seconds), over time periods from 30 to 90 minutes. It was necessary that the valve plunger be moved to the same position during every regeneration. Also, it was necessary that provision be made for varying the time periods during which the valve remained at the various valve positions. (Tran. p. 23) Competitive pricing also was a necessary requisite. (Tran. p. 25)

9. The Rostens devised a control system for their previously operated manual valve which they believed would solve the foregoing problems. (Tran. p. 23) On about the first of January, 1956, they commenced selling valves embodying this control system, which valves were designated as Model M3 valves. (Tran. pp. 22, 128) Approximately 2000 of these Model M3 valves were sold. (Tran. pp. 21, 128)

10. On July 12, 1956, the Rostens filed in the United States Patent Office an application for a patent, which application matured into the patent in suit, No. 2,906,332, granted by the United States Patent Office on September 29, 1959. This patent illustrates and describes the automatic control apparatus embodied in the valves which the plaintiffs previously had been making and selling, i. e., the Model M3 (Tran. p. 21); however, the reach of Claim 9 of said patent is as discussed in paragraph 37 of these findings of fact.

11. The Model M3 valve incorporated a cycle timer and a calendar timer. (Tran. p. 31) The calendar timers (parts 95, 101 and 101b of the patent) had been purchased from International Register Company. (Tran. pp. 41, 45) The cycle timer was not a purchased item. (Tran. p. 41)

12. The plaintiffs had talked with International Register Company about obtaining a multi-circuit timer and in 1961 they were approached by International Register Company with respect to providing a fund for the tooling for a new multi-circuit timer. (Tran. pp. 44, 45) An agreement was entered into between the plaintiffs (i e., the partnership) and International Register Company whereby the plaintiffs advanced the sum of $2,500 to International Register Company to be

applied toward tooling of the new timer with the understanding that the plaintiffs would receive a credit of $1.00 per timer on the first 3000 of the new timers purchased. (Tran. p. 45) There were a number of other companies that similarly made contributions to the tooling fund of International Register Company. (Tran. pp. 40, 41) The new IRC Model 7000 Series timers became available in January 1962. (Tran. p. 46) In January 1962 the plaintiffs commenced making the present Model M3B valve which incorporated this new timer. (Tran. p. 46)

13. Commencing in May 1961 the defendant purchased the plaintiffs' Model M3A valve, which is not covered by the claim in issue. (Tran. pp. 47, 134) These sales continued until January 1962. (Tran. p. 119) In February 1962 the plaintiffs commenced selling its Model M3B valve to the defendant, which sales continued until May 1962. (Tran. pp. 47, 119; Def. Ex. 27)

14. On about May 7, 1962, the defendant commenced making an automatic water softener valve. (Tran. p. 197) Defendant's initial valve is of the type shown as Exhibit 1, which it has been stipulated does not infringe the patent in suit. (Pl. Ex. 22) Because of the difficulty of the timer getting out of phase with the valve motor, the defendant changed from this original valve to the model charged to be infringed, exemplified by plaintiffs' Exhibit 3, on about January 1, 1963. (Tran. pp. 187, 191, 196)

15. Claim 9 of Patent 2,906,332 is the only claim in issue. This claim pertains to a control apparatus for a motor-driven water softener wherein, at preselected time intervals, a timer orders the valve motor to move to the successive positions of backwash, regeneration and service and wherein switches actuated by the valve motor cause the valve motor to stop when the position to which the valve motor has been so directed to move has been reached. (Claim 9)

16. The accused water softener control apparatus is represented by plaintiffs' Exhibits 3 and 3A and the defendant has sold water softeners incorporating control apparatus of this type in this district within the last six years. (Stip. Pl. Ex. 22; Tran. p. 51)

17. Plaintiffs' Exhibit 29 is a diagrammatic representation of the accused control apparatus. (Tran. pp. 253–260)

18. The accused control apparatus being sold by the defendant is of a type wherein, at preselected intervals, a timer orders the valve motor to move to successive positions and wherein switches actuated by the valve motor cause the valve motor to stop when the position to which the valve motor has been so directed to move has been reached. (Tran. pp. 54–66, 253–275)

19. Application Serial No. 597,459, which matured into United States Letters Patent No. 2,906,332, here in suit, was duly filed in the United States Patent Office on September 29, 1959, by joint alleged inventors, Randolph T. Rosten and Philip W. Rosten. Randolph T. Rosten and Philip W. Rosten considered themselves to be the first and original joint inventors of the subject matter defined by Claim 9 of the patent in suit. They made oath to this fact. This application was reviewed by the experts of the United States Patent Office and was duly and legally issued by the Patent Office in the form of the patent in suit. (Def. Ex. 30)

20. In all, the plaintiffs have sold approximately 14,500 water softener valves embodying the alleged invention of Claim 9 of the patent in suit up to November 1964. (Tran. pp. 544–547)

21. In August 1962 plaintiffs charged defendant in writing with infringement of Patent No. 2,906,332 and the present suit was filed in March 1963. (paragraph No. 6 of the Complaint and the Answer thereto)

22. In January 1963 defendant discontinued sales of water softeners utiliz-

ing the construction of plaintiffs' Exhibit 1 and at that time it began selling, within the Western District of Wisconsin and elsewhere, water softeners utilizing the construction of plaintiffs' Exhibit 3, which construction is still being used by the defendant. (Pl. Ex. 22, par. 6; Tran. p. 187) Plaintiffs did not learn about the latter construction (Pl. Ex. 3) until the taking of Mr. Borgerud's deposition on October 3, 1963 (Tran. pp. 117, 118, 196) more than six months after suit was filed.

23. Plaintiffs now allege that defendant's water softeners utilizing the construction of plaintiffs' Exhibit 3 infringe Claim 9 of Patent No. 2,906,332 but concede that the latter construction does not infringe any of Claims 1 to 8, inclusive, of the latter patent. (Pl. Ex. 22, par. 8)

24. Plaintiffs now concede that defendant's water softeners utilizing the construction of plaintiffs' Exhibit 1 do not and have not ever infringed any claim of Patent No. 2,906,332. (Pl. Ex. 22, par. 7)

25. Between 1955 and 1961 plaintiffs manufactured and sold motorized valves substantially identical with Figs. 1, 2, 3, 5, 6, 7, 8, 9, 10, and 11 of the patent in suit under the trade designation "Model M3" and during approximately a six-year period between 1955 and 1961 were able to sell only 1,946 of the Model M3 units. (Tran. pp. 542–544) During this period moderate sums were expended in advertising and promoting sales of the Model M3 units. (Tran. pp. 541–542) During each year of this six-year period and during each succeeding year to date the potential market for water softeners in the United States has been very large and in excess of several hundred thousand units per year. (Tran. pp. 162, 313) There are over one hundred water softener manufacturers in the United States. (Tran. p. 162)

26. No one other than the defendant in the present action has been charged with infringement of Patent No. 2,906,-332. (Tran. p. 542) No one is licensed under the patent. (Tran. pp. 539–540)

27. In 1961 plaintiffs discontinued their Model M3 units like the patent in suit (Tran. p. 544) and instead began manufacturing a control system and valving which was marketed under the trade name "Model M3A". (Def. Ex. 24, 25; Tran. pp. 47, 86) Although the Model M3A units were marked with the patent number 2,906,332, plaintiffs conceded during the trial that the claims of the patent do not and did not ever cover any of these units. (Tran. pp. 97, 134) Plaintiffs sold the Model M3A units until 1962 when a new multi-circuit timer manufactured by International Register Company of Chicago, Illinois, became available on the market, at which time sales of the Model M3A were discontinued. (Tran. p. 87) International Register Company had developed a prototype of this new timer (Tran. p. 153) and, in early 1961, they sought capital from water softener manufacturers and others, including the plaintiffs, for tooling and production of the new timer. (Pl. Ex. 12; Tran. pp. 44, 114) International Register Company obtained over sixty thousand dollars in financing through this plan (Tran. p. 115), $2,500 of which was furnished by the plaintiffs. (Pl. Ex. 12) The money advanced by each of the contributors to the plan became, in effect, an advance payment for timers to be delivered by International Register Company in the future at a discount price. (Pl. Ex. 12) For each one dollar advanced, the contributor received a credit of one dollar and twenty cents applicable to the future purchase of a timer. (Pl. Ex. 12, par. 2) Under the terms of the agreements, International Register Company could manufacture and deliver its multi-circuit water softener time switch to all water softener manufacturers and others. (Pl. Ex. 12, par. 1)

28. The timers produced by International Register Company were so much simpler and so much better than the arrangement shown in Patent No. 2,906,332 (Tran. pp. 45–46, 87, 316) that, in January 1962, when these timer units first

became available, plaintiffs discontinued manufacture and sale of the Model M3A valve units and instead began purchasing timing units from International Register Company for use in valving systems which were marketed under the trade designation "Model M3B" valves. (Tran. pp. 45–46)

29. In 1962, the first year of use of the International Register Company timer, plaintiffs' sales of their "Model M3B" valve units almost equalled the total sales of the patented Model M3 valves for the entire six-year period between 1955 and 1961. (Tran. p. 546)

30. In 1963 plaintiffs' sales of the Model M3B valves increased to more than three thousand and they have grown since that time. (Tran. pp. 39, 546)

31. Defendant never purchased any of the patented Model M3 valves from plaintiffs (Tran. pp. 47, 86) and there is no evidence that defendant had ever seen these valves prior to the filing of the suit. Defendant, in developing its valve units (Pl. Ex. 1, 3), did not copy any of plaintiffs' valves. (Tran. pp. 218, 548–549) The Model M3A valves purchased by defendant were admittedly unpatented (Tran. pp. 97, 119–120) and, in addition, were different from the patented valves and from defendant's valves. (Pl. Ex. 1, 3; Def. Ex. 24, 25) The construction of the Model M3B valves purchased by defendant from plaintiffs is not clear from the record but they were also different from the patented valves and from defendant's valve units (Def. Ex. 11; Pl. Ex. 1, 3) in that defendant's present valve unit (Pl. Ex. 3) uses a four position valve stopping in backwash, brining, fast rinse and service, whereas all of plaintiffs' units were three position units prior to 1965 when plaintiffs made their "Model 51" four position valves. (Tran. pp. 79–80)

32. The application for Patent No. 2,906,332 was filed in the United States Patent Office on July 12, 1956, and was given Serial No. 597,459. Originally this application contained 24 claims (Def. Ex. 30, pp. 22 to 31) The Examiner re-jected all of these claims on a number of grounds including unpatentability over the prior art. (Def. Ex. 30, pp. 41 and 42) In response to the latter rejection, the applicants cancelled all 24 of the original claims and submitted 14 new claims numbered 24 to 38, inclusive. (Def. Ex. 30, pp. 43–49) The Examiner rejected all of the new claims and relied primarily upon Staegemann Patent 1,914,333. (Def. Ex. 30, pp. 55–57) In response to this rejection, the Rostens cancelled claims 25 to 38 on December 8, 1958, and substituted therefor claims 39 to 47, which became the patent claims 1 to 9, respectively. (Def. Ex. 30, pp. 58–66) In the remarks accompanying the amendment adding the latter claims, the applicants' attorneys recognized that Staegemann Patent 1,914,333 was the "principal reference" (Def. Ex. 30, p. 63) and asserted that it was "unnecessary to discuss the other references." (Def. Ex. 30, p. 64) Following an Examiner's amendment to correct minor errors (Def. Ex. 30, p. 67), the application Serial No. 597,459 was allowed. (Def. Ex. 30, p. 69)

33. Claim 9 of the patent in suit is directed to systems for controlling the re-generation of a water softener and specifically to systems for controlling movement of multiple position valves in timed sequence. (Pl. Ex. 8, cols. 11 and 12) Water softener regeneration systems of this type were well known in the art long prior to the filing date of the patent in suit. (Perrin Patent 2,631,665, Def. Ex. 31; Pick Patents 1,937,324 and 1,937,325, Def. Ex. 31; Clark Patent 2,003,739, Def. Ex. 33; and Staegemann Patent 1,914,333, Def. Ex. 32, for example)

34. In May 1963 defendant filed its original answer to plaintiffs' complaint and directed attention to Shippy Patent 1,820,252 and Perrin Patent 2,631,665. (Def. Original Answer, par. 9)

35. Claim 9 of the patent in suit defines an assembly of separate elements each of which, by itself, was admitted by plaintiffs to have been old prior to 1955. (Tran. pp. 148–151) Specifically each of the separate elements disclosed in

the Rosten patent which constitute Claim 9 are also found in the Perrin Patent No. 2,631,665 and in the Shippy Patent No. 1,820,252 and perform exactly the same functions in each, in the same way as follows:

| Rosten, et al, 2,906,332 (Def. Ex. 40, 41) | Perrin 2,631,665 (Tran. 444–449; Def. Ex. 40) | Shippy 1,820,252 (Tran. 449–450; Def. Ex. 41) |
|---|---|---|
| Valving means 23 | Valve assembly 4 | Valve 30 |
| Valve motor 89 for controlling the valving means 23 | Valve motor 25 for controlling the valve assembly 4 | Valve motor 43 for controlling the valve 30 |
| Cam wheel 88 driven by valve motor 89 | Cam wheel 52 driven by valve motor 25 | Cam wheel 74 driven by valve motor 43 |
| Switches 120, 128 and 138 operated by followers riding on cam wheel 88 for stopping the valve motor in each of the different valve positions | Switches provided by double throw switch 49 operated by a follower riding on cam wheel 52 for stopping the valve motor 25 in each of the different valve positions | Switches 52, 64 and 53, 65 operated by followers riding on cam wheel 74 for stopping the valve motor 43 in each of the different valve positions |
| Timing control motor 90 | Timing control motor 29 | Timing control motor 100 |
| Control disc means or cams 92, 93 and 94 driven by timing control motor 90 | Control disc means or cams 31 and 41 driven by timing control motor 29 | Control disc means or cams 110, 124, 127 and 130 driven by timing control motor 100 |
| Switches 117 and 137 operated by the control disc means for starting the valve motor 89 | Switches provided by double throw switch 47 operated by the control disc means for starting the valve motor 25 | Switches including contacts 140, 141, 142, 143 and 144, 145 operated by the control disc means for starting the valve motor 43 |
| Said control disc means including a cam notch 180 in cam 92 and switch 110 for stopping the control motor 90 at end of cycle. | Said control disc means including cam surfaces 32 and 33 on cam 31 and switch 35 for stopping the control motor 29 at end of cycle | Said control disc means including a cam notch 122 in cam 110 and switch 102, 103 for stopping the control motor 100 at end of cycle |
| Switch 101 or push button 162 independent of valve motor for starting the control motor | Switch 37 independent of valve motor for starting the control motor | Knob 240 (Figs. 20 and 21) independent of valve motor for starting the control motor |

36. There were no new or unusual or surprising results flowing from the unification of the elements recited by Claim 9 of the patent in suit. (Tran. pp. 450, 451) The starting of the control motor prior to movement of the valving means to the first or backwash position is merely a description of the order in which the parts operate and is not, as stated by plaintiffs' expert witness (Tran. pp. 289, 290), a new and unexpected result flowing from the assembly of elements called for by Claim 9. The alleged new result or mode of operation described by plaintiffs' expert witness is disclosed in the prior art including Perrin Patent 2,631,-665 and Shippy Patent 1,820,252 (Tran. pp. 450, 451) which were not cited by the Patent Office (Pl. Ex. 8; Def. Ex. 30) and which were not considered by plaintiffs' expert, who confined his testimony to the prior art cited by the Patent Office. (Tran. pp. 242, 274, 286) Thus in the structure shown in the Perrin Patent, the control motor 29 begins to run independently of the valve motor 25 before the valve motor is effective to move the valve 4 to the first or backwash position. (Tran. p. 450) Similarly, in the structure shown in Shippy Patent No. 1,820,252 the control motor 100 begins to run independently of the valve motor 43 and prior to the movement of the valve 30 to the first valve position. (Tran. pp. 450, 451) Automatic restoration, i. e., the ability of the system shown in the patent to restore itself automatically to proper cycle if the valve motor and the timer motor should become out of cycle, was not an unexpected and surprising result.

37. The automatic restoration feature is not recited in Claim 9 (Tran. pp. 137, 287) and it is not inherent from the assembly of elements recited by this claim. (Def. Ex. 45A to 45I, 46; Tran. pp. 475, 476, 491) A system (Def. Ex. 45A to 45I) having parts respectively responding fully to every element of Claim 9, both in term and in substance (Tran. p. 491), would not necessarily accomplish the automatic restoration of the valve and the timer motor to proper cy-

cling. (Tran. p. 491) Moreover, the automatic restoration feature was present in plaintiffs' M3A valves which admittedly are not covered by Claim 9 of the patent in suit. (Tran. 88, 97, 111, 119, 120)

38. Plaintiffs' expert testified that three circuits were required to provide the automatic restoration in a three position system like that defined by Claim 9, but admitted that the claim does not specifically recite these three circuits. (Tran. pp. 285, 286) If Claim 9 were construed to include the automatic restoration feature by the provision of three separate circuits, it would be invalid for failure to "particularly point out and distinctly claim" the subject matter which is regarded as the invention, as required by 35 U.S.C. § 112.

39. Water softener systems using a motor to drive a valve to different positions including backwash, regeneration and service were well known in the prior art before 1955. (Tran. pp. 355–369, 378–385, 409–417) One such system is shown in Perrin patent 2,631,665, while another is shown in Pick patent 1,937,-324. (Def. Ex. 31)

40. Perrin patent 2,631,665 discloses a water softener regeneration system including a valve 4 driven by a motor 25 to backwash, brining, rinsing and service positions. The motor 25 drives a cam wheel 52 for actuating the two switch sections of a single pole, double-throw switch 49. (Tran. p. 436) A single pole, double-throw switch is actually two switches (Pl. Ex. 29, Tran. p. 270), one normally closed and one normally open. The two sections of Perrin's switch 49 serve to stop the valve motor 25 in the four positions of the regenerating cycle. Every element of Claim 9, both in term and in substance as well as function, is found in the Perrin patent 2,631,665 except that Perrin employs a single pole, double-throw switch having only one cam follower, while the claim recites "switches" having cam "followers". (Def. Ex. 40) Shippy patent 1,820,252 discloses a control circuit in which two single pole, single-throw switches 52, 64 on the one

hand, and 53, 65 on the other hand, operated by cam followers 72 and 73 respectively, control the operation of a valve motor 43. (Tran. pp. 437, 438) It would have been obvious to one skilled in the electrical control circuit art in 1955 to have used two single pole, single-throw switches and the two cam followers like those shown in the Shippy patent to perform the same function as and to replace the single pole, double-throw switch 49 and the single cam follower shown in the Perrin patent. (Tran. pp. 437, 438)

41. Shippy patent 1,820,252 shows an electrical control circuit for operating a valve 30 automatically to four different positions in order to control the operation of a hydraulic press rather than the operation of a water softener. Every element of Claim 9 except for the environmental references to water softeners is found in the Shippy control circuit and it would have been obvious to one skilled in the electrical control and water softener control arts prior to 1955 to have used the Shippy control system for controlling a four position valve like the valve 4 shown in the water softener control system of the Perrin patent 2,631,-665 or the valve shown in Figs. 3 to 8, inclusive, of Pick patent 1,937,325. (Def. Ex. 41; Tran. pp. 438–444) To use the Shippy system for controlling a four position water softener valve one would merely connect the output shaft 32 shown in Fig. 1 of the Shippy patent to the shaft 18 of Perrin or to the valve shaft shown in the Pick '325 patent. (Tran. pp. 442–444)

42. The disclosures of the Shippy patent 1,820,252 and the Perrin patent 2,631,665 are more pertinent with respect to Claim 9 of the patent in suit than the references cited by the Patent Office during the prosecution of the application which resulted in the grant of the patent in suit. (Tran. pp. 451–453)

43. The International Register timer used in defendant's structure (Pl. Ex. 3, 3A) includes a continuously running clock motor which never stops and which acts to move once each 90 seconds (Tran. p.

57) a pawl that normally rides within a toothless area of a relatively large diameter ratchet wheel. (Def. Ex. 42B, 44; Tran. pp. 56, 462–464) The extent of movement of the pawl is normally insufficient to advance the ratchet wheel. When the time arrives for regeneration of the water softener, a mechanism is automatically actuated by a day wheel to cause an additional movement of the pawl so that the pawl engages a toothed area on the ratchet wheel adjacent the toothless portion, thereby to advance the ratchet wheel one step. (Tran. pp. 463–465) Thereafter, throughout the regenerating cycle the periodic movement of the pawl every 90 seconds causes a step by step movement of the ratchet wheel so that the ratchet wheel is turned one complete revolution during a three-hour period (Tran. p. 66) which comprises a regenerating cycle. The ratchet wheel moves one step in a matter of a second or so and then is stationary for the remainder of the 90-second period after which the process is repeated (Def. Ex. 43; Tran. p. 57) throughout the complete revolution of the ratchet wheel. At the end of the regenerating cycle the pawl again encounters the toothless area of the ratchet wheel so that the ratchet wheel can no longer be advanced and, hence, the ratchet wheel remains stationary for a preselected period from one to twelve days (Tran. p. 66) until the next regenerating cycle. The ratchet wheel carries a number of cams or control discs which actuate switches for starting the valve motor at the start of each step of the four step regenerating period. (Discs 28 on Def. Ex. 42B)

If the valve motor ever becomes out of cycle with the timer then at the time when the timer is restored to the service condition a circuit is completed to drive the valve motor until it also reaches the service position. (Tran. pp. 139, 140) The automatic restoration accomplished by defendant's structure differs from the arrangement shown in the patent in suit since it occurs immediately upon the completion of the regenerating cycle and without awaiting the start of the next or

succeeding regenerating cycle as in the patent in suit. (Tran. pp. 139, 140) Defendant's structure (Pl. Ex. 3) uses only three circuits to stop the valve in four separate positions. (Tran. pp. 288, 289) Thus, defendant's structure does not use a separate circuit for each valve position, the feature of the patented structure which was necessary to provide self-restoration. (Tran. p. 138)

44. The ratchet wheel of the International Register timer is not a motor. A device such as the ratchet wheel used in defendant's structure (Pl. Ex. 3), which has motion imparted to it by a motor driven mechanism, is not a motor. (Def. Ex. 44; Tran. pp. 465, 496, 497) Thus, Claim 9 does not read literally upon defendant's structure because the claim recites a control motor arranged to begin running independently of the valve motor. (Def. Ex. 44) The control motor 90 of the patent in suit may be started independently of the clock mechanism 95 (Pl. Ex. 8, col. 7, lines 45–54, inclusive; Tran. pp. 496–497) to achieve automatic regeneration. If the corresponding clock mechanism were eliminated in defendant's structure (Pl. Ex. 3) it would be impossible to regenerate the water softener automatically because the ratchet wheel would not turn. (Tran. pp. 496, 497) Thus, the ratchet wheel used in defendant's structure is not the mechanical equivalent of the control motor 90 used in the patented system because it does not comprise substantially the same structure for performing the same function in the same way. (Tran. pp. 466, 467) Moreover, the ratchet wheel and cams associated therewith move the extent of one tooth in about a second (Def. Ex. 43), are stationary for 90 seconds (Tran. p. 57), then move the extent of another tooth in about a second, are again stationary for another 90 seconds and so on throughout a three-hour period (Tran. p. 66) to complete one revolution. Thus, the ratchet wheel, even if considered to be a motor, does not rotate constantly as required by Claim 9.

45. The means for stopping the control motor after the valve has been returned to service position in the patented system comprises an electric switch 110 controlled by the cam disc 92. (Def. Ex. 44) This switch, when opened, interrupts the circuit to the control motor 90 and causes the motor to stop. (Tran. p. 46) The clock motor in defendant's structure runs continuously and is never stopped unless the water softener is unplugged from the electrical service outlet. (Tran. p. 472) The step by step advancement of the ratchet wheel used in defendant's structure is terminated when the pawl reaches the missing tooth area on the wheel but a pawl and a missing tooth are not the mechanical equivalent of an electric switch because they do not comprise susbtantially the same structure for performing the same function in the same way. (Tran. p. 474) The missing tooth merely permits the pawl to move without advancing the ratchet wheel while the electric switch in the patented structure interrupts an electrical circuit to a motor at the end of the regenerating cycle. (Tran. p. 474)

46. The art pertaining to automatic regeneration of water softeners and the analogous art relating to electrical timers in general was a very crowded one prior to 1955 so that plaintiffs are entitled only to a very narrow range of equivalents for Claim 9. (Def. Ex. 31, 32, 33)

47. Any finding of fact entered herein which may be construed in whole or in part as a conclusion of law shall be so deemed and treated as if set forth under Conclusions of Law herein.

## CONCLUSIONS OF LAW

1. The court has jurisdiction of the subject matter and the parties hereto.

2. Defendant has successfully carried its burden of establishing invalidity of Claim 9 of the Rosten, et al, patent in suit and Claim 9 of the Rosten, et al, Patent No. 2,906,332 is invalid.

3. Commercial success of plaintiffs' structure would not validate Claim 9 which does not define invention over the prior art.

4. Claim 9 of the Rosten, et al, patent in suit is not infringed by either of defendant's structures, plaintiffs' Exhibit 1 or plaintiffs' Exhibit 3, and plaintiffs have not sustained their burden of proof on this issue.

5. Defendant is entitled to costs.